## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

LIFEBRITE HOSPITAL GROUP, LLC,

      Plaintiff,

v.

ECHP, INC.,

      Defendant.

Civil Action No.
1:24-cv-00303-VMC

## OPINION AND ORDER

The Court held a hearing on Plaintiff LifeBrite Hospital Group, LLC's ("LifeBrite") Motion for Preliminary Injunction ("Motion," Doc. 34) on November 18, 2024 ("Hearing"). Defendant ECHP, Inc. ("ECHP") filed a response in opposition to the Motion and opposed the Motion at the Hearing.[1] The Parties did not present live testimony, and the Court heard the Motion solely on the Parties' affidavits. Fed. R. Civ. P. 43(c).

At the Hearing, the Court took the matter under advisement. This Opinion and Order constitutes the Court's findings of facts and conclusions of law pursuant to Federal Rule of Civil Procedure 52(a)(2). For the reasons that follow, the Court will deny the Motion.

---

[1] Defendant's Motion for Leave to File Sur-Reply (Doc. 41) is granted.

## Background

### I.    The Transaction

On February 1, 2023, LifeBrite sold its interest in a company, LifeBrite Hospital Group of Early, LLC (the "Company") to ECHP under a Member Substitute Agreement ("MSA"). (Doc. 36-1 at ECF p. 14). Under the MSA, the purchase price for LifeBrite's interest in the Company was $1,000,000, with $120,000 paid at closing and the remaining $880,000 to be seller-financed through execution of a Secured Promissory Note, defined in the MSA as the "Note." (*Id.*).

The Note was dated February 1, 2023. (Am. Compl. Ex. 1, Doc. 10-1). It specified that it was "secured by a security interest in the limited liability company member interest" in the Company. (*Id.*). The Note specified that payment was "absolute and unconditional." (*Id.*). It provided the following remedy for foreclosing on the security interest:

> In the event [ECHP] fails to make a payment hereunder, is declared in default by [LifeBrite], and such default persists for sixty (60) days or longer, [LifeBrite] may foreclose on the security interest granted herein. Foreclosure may be carried out by written Notice to [ECHP], and in which case [LifeBrite] shall be deemed the sole owner of the Interest and [ECHP] shall surrender to [LifeBrite] possession of the assets of [the Company] (including such company known by any subsequent name).

(*Id.*).

The MSA also imposed indemnification obligations on both parties. Section 10.2 of the MSA covers LifeBrite's indemnification responsibilities. Under the agreement, subject to certain limitations, the MSA provides that LifeBrite and its members must indemnify ECHP and certain other ECHP-related parties "from and against any and all Losses[2] that such Authority [sic] Indemnified Parties incur" as a result of several causes, including those stemming from "the business or operations of LifeBrite and its Affiliates relating to the [Company] . . . conducted, existing, or arising at or prior to the Closing," or "any ongoing, threatened or future Action[3] or Third Party Claim[4] against LifeBrite" or its affiliates "relating to alleged improper billing of claims by the [Company or certain LifeBrite affiliates], . . . or any similar or related acts that violate any applicable Law." (Doc. 36-1 at ECF p. 40–41).

---

[2] The MSA defines Losses somewhat circularly to include "all losses, liabilities, damages, costs (including, without limitation, court costs and costs of appeal), fines, penalties, and expenses (including, without limitation, reasonable attorneys' fees and fees of expert consultants and witnesses), whether or not involving a third-party claim." (Doc. 36-1 at ECF p. 40).

[3] The MSA defines "Action," for purposes of Section 10.2 to mean "any claim, action, cause of action, demand, lawsuit, arbitration, inquiry, audit, notice of violation, proceeding, litigation, citation, summons, subpoena or investigation of any nature, civil, criminal, administrative, regulatory or otherwise, whether at law or in equity." (Doc. 36-1 at ECF p. 41).

[4] The MSA Defines "Third Party Claim" to mean "any claim or liability . . . asserted in writing by a third party." (Doc. 36-1 at ECF p. 41).

One of the limitations on indemnification mentioned above is a provision, Section 10.3(b), which requires that "[i]n the event of an indemnity claim by an ECHP Indemnity Party against any LifeBrite Indemnity Party, such ECHP Indemnity Party or Parties shall look first to the then-outstanding balance of the Note, which shall be set-off and reduced by the amount of such party's Losses." (*Id.* at ECF p. 41).

## II.    Events Following Closing

In November of 2022, the Company was notified by United Healthcare that United Healthcare was seeking a refund from the Company in the amount of $137,616.32 for overpayments related to laboratory work (the "United Demand"). (Declaration of Morgan Dunn dated Oct. 25, 2024 ¶ 20, "Dunn Decl.," Doc. 36-1). The United Demand was not resolved before the effective date of the MSA, and as of October 2024, was still outstanding. (*Id.* ¶¶ 21, 22).

On February 20, 2019, Cigna sent a letter to the Company seeking a refund of $563,924.58 allegedly stemming from improper billing practices (the "Cigna Demand"). (*Id.* ¶ 23). The Cigna Demand was not resolved on the MSA closing date and was not disclosed to ECHP during negotiations. (*Id.* ¶ 25). ECHP tendered the United Demand and Cigna Demand to LifeBrite and its principal Christian Fletcher, who denied the tenders. (*Id.* ¶ 26). After that point, ECHP and the Company settled the Cigna Demand for $175,000.

At some point after the February 2023 closing, the Company received a notice from the Equal Employment Opportunity Commission (EEOC) that a former employee submitted a charge of discrimination against the Company stemming from alleged discrimination and retaliation in September 2022 (the EEOC Charge"). (*Id.* ¶ 28). ECHP and the Company requested indemnification for the EEOC Charge from LifeBrite, who denied the request. (*Id.* ¶ 30). The Company subsequently settled the EEOC Charge for $2,000, incurring $9,336 in attorney's fees in the process. (*Id.* ¶ 31–32).

ECHP made the first eight payments under the Note, totaling $408,829.89. (*Id.* ¶ 34). However, it withheld the final seven payments under the Note, $541,561.86, as a "setoff" for the dishonored indemnity obligations. (*Id.*).

After ECHP failed to make at least four monthly payments under the Note, (Doc. 10 ¶¶ 7–11), LifeBrite provided notice of the default on November 2nd and 13th of 2023. (*Id.* ¶ 12; Doc. 10-2). LifeBrite issued a Notice of Foreclosure on January 11, 2024. (Doc. 10. ¶ 14).

On January 12, 2024, LifeBrite filed a Verified Petition for Writ of Possession seeking possession of the Company in the Superior Court of DeKalb County, Georgia. (Doc. 1 at 12). It was removed to this Court by ECHP on January 22, 2024. (Doc. 1 at 1).

Meanwhile, the Company and ECHP filed suit against LifeBrite and its Manager and CEO Christian Fletcher in 2023. *LifeBrite Hosp. Group of Early, LLC, et al. v. LifeBrite Hosp. Group, LLC, et al.*, No. 2023V-023 (Ga. Super. Ct. Early Cnty. 2023) ("Early County Litigation") (Doc. 4-1 at ECF p. 12).[5] The Early County Litigation alleged that LifeBrite breached the MSA by, among other things, "failing to satisfy accounts payable and reimbursement demands that were due prior to the closing," by "transfer[ring] . . . $1 million from the Hospital's account to Mr. Fletcher's personal account . . . result[ing] in a 'material adverse change' in the [Company's] financial condition," and by failing to defend and indemnify the Company "against charges of discrimination filed against the Hospital that relate to conduct which occurred in the fall of 2022, prior to the sale." (*Id.* at ECF p. 23–26). ECHP sought a judgment for money damages. (*Id.* at ECF p. 30). In response, LifeBrite counterclaimed for unpaid amounts under the Note, also seeking a judgment for money damages. (*Id.* at ECF p. 54–55).

## III.    The Company's Condition

The Parties dispute the financial condition of the Company during and before the litigation.[6] For example, LifeBrite accuses ECHP of accumulating

---

[5] The Court has already taken judicial notice of the court filings in the Early County Litigation.

[6] The Court does not endeavor to recount every issue the Parties have raised.

accounts payable exceeding $1 million, causing the Company to take on a $712,392.08 line of credit, and several other new loans including a $205,950.50 loan from First State Bank (with $180,397.47 outstanding) and a $243,750 loan from Samson Funding (of which $162,500 remains outstanding). (Declaration of Amber Fletcher dated Oct. 10, 2024 ¶¶ 10, 11, Doc. 34-2).

According to Morgan Dunn, the director and CEO of ECHP, rural hospitals like the one operated by the Company receive government subsidies and payments, including the Medicare Disproportionate Share Hospital ("DSH") adjustments and Medicaid Upper Payment Limit ("UPL") supplemental payments to assist with and encourage the provision of medical care to Medicare and Medicaid recipients in their communities. (Declaration of Morgan Dunn dated Oct. 25, 2024 ¶¶ 2, 15 "Dunn Decl. I," Doc. 36-1). Because the DSH and UPL are paid in lump sums at the end of the year, Ms. Dunn asserts that the Company historically determines its financial condition at the end of the year. (*Id.* ¶ 15). Ms. Dunn estimated in late October that after receipt of the subsidies, the Company would be profitable or break even, despite that fact that "its liquid assets were drained by prior ownership." (*Id.* ¶¶ 15–16). She understood that the Hospital Authority of Early County, the Company, and ECHP had a good relationship since the purchase of the Company. (*Id.* ¶¶ 4, 13).

Ms. Dunn asserts that ECHP undertook to improve the Company's workforce, equipment, and services, which included repairs exceeding $1,500,000. (*Id.* ¶ 17). She asserts that the First State Bank loan was for a new ambulance and contends that this loan along with the Samson Funding loan are being paid down each month. (Declaration of Morgan Dunn dated Nov. 15, 2024 ¶¶ 25, 31, "Dunn Decl. II," Doc. 41-2). She explains that the line of credit is "tied to a subsidy received from the Early County Board of Commissioners," and will be paid down to zero once the Board provides funding. (*Id.* ¶ 23–24). Finally, she points out that receivables are always high before the UPL/DSH payments. (*Id.* ¶ 15).

In contrast, Mr. Fletcher argues that, as of early November, the Company should have already received the UPL subsidies for fiscal year 2024 in August, raising a question as to the Company's continued eligibility and financial condition. (Declaration of Christopher Fletcher dated Nov. 8, 2024 ¶ 8, "Fletcher Decl. I," Doc. 37). Mr. Fletcher further argues that the Company has paid $760,356 in management fees to Vestra, LLC, which is managed by Ms. Dunn, and $408,830 in distributions with no legitimate business justification. (*Id.* ¶ 10). Mr. Fletcher argues that the Company is on the verge of bankruptcy and closure, threatening access to Early County residents as it is the only hospital within a 35-mile radius. (*Id.* ¶ 13).

In reply, Ms. Dunn states that the Company did receive a UPL payment in August and is on track to receive the DSH payments later this year or early next year. (Dunn Decl. II ¶¶ 5–6). Ms. Dunn points out that Vestra's contract with the Company predates ECHP's acquisition of the Company, and is performance based. (*Id.* ¶ 33–35). Ms. Dunn argues that the $408,000 in distributions were to pay down the Note for the purchase of the Company by ECHP.

## IV.    Procedural History and Hearing

After the case was removed to this Court on January 22, 2024, ECHP filed a Motion to Dismiss or Stay on claim-splitting grounds the same day. (Doc. 4). The Court denied that motion on July 11, 2024, and ordered expedited discovery. (Doc. 21). On October 11, ten months after the case was originally filed in superior court, LifeBrite filed the instant Motion. At the Hearing on the Motion, ECHP offered to post a bond in the full amount of $541,000 within 14 business days of the hearing. (Transcript of Nov. 18, 2024 Hrg. 4–5, "Tr.," Doc. 45).

## Legal Standard

A preliminary injunction is "an extraordinary remedy." *Bloedorn v. Grube*, 631 F.3d 1218, 1229 (11th Cir. 2011). A district court has broad discretion to grant injunctive relief if the movant shows: "(1) substantial likelihood of success on the merits; (2) irreparable injury will be suffered unless the injunction issues; (3) the threatened injury to the movant outweighs whatever damage the proposed

injunction may cause the opposing party; and (4) if issued, the injunction would not be adverse to the public interest." *McDonald's Corp. v. Robertson*, 147 F.3d 1301, 1306 (11th Cir. 1998). "In this Circuit, a preliminary injunction is an extraordinary and drastic remedy not to be granted unless the movant clearly established the burden of persuasion as to each of the four prerequisites." *Siegel v. LePore*, 234 F.3d 1163, 1176 (11th Cir. 2000).

## Discussion

LifeBrite's Motion makes two requests: one for a pretrial writ of possession under Georgia law, and one for a preliminary injunction to preserve the condition of the hospital pending the issuance of a posttrial writ of possession. (Doc. 34-1 at 3). The Court considers these requests separately.

## I.    Request for Relief under Georgia Law

In a personal property foreclosure action under O.C.G.A. § 44-14-230 *et seq.*, certain pretrial remedies are available under Georgia law. Specifically, O.C.G.A. § 44-14-234 contains procedures for requiring payment into court pending trial and for a pretrial writ of possession to permit the secured creditor to retain the collateral pending a trial.

### A.    Law Applicable to Request for Relief

As an initial matter, LifeBrite's request for a pretrial writ of possession under O.C.G.A. § 44-14-234(4), though styled as a motion for preliminary

injunction under Rule 65, is more properly viewed as a request for provisional remedy under state law subject to Rule 64. *Rosen v. Cascade Int'l, Inc.*, 21 F.3d 1520, 1530–31 (11th Cir. 1994) ("As this court has explained, '[w]hen faced with motions appearing to call for an attachment but labelled something else, federal courts . . . look past the terminology to the actual nature of the relief requested.' . . . Accordingly, we conclude that 'Rule 64, and not Rule 65 (which governs injunctions generally), provides the standard for evaluating a request for preliminary injunctive relief that is, in reality, no more than a request for prejudgment attachment; Rule 64 thus properly controls our disposition of [this case].'") (quoting *Mitsubishi Int'l Corp. v. Cardinal Textile Sales, Inc.*, 14 F.3d 1507, 1521 (11th Cir. 1994)). Courts across the country have reviewed requests for pretrial writs of possessions under Rule 64. *Davis v. Yrrow On, LLC*, No. 4:23-CV-00301-DCN, 2023 WL 6808385, at *2 (D. Idaho Oct. 13, 2023); *Trans-Bridge Lines, Inc. v. Luxury Coach of Am. LLC*, No. 5:24-CV-00288-PG, 2024 WL 1684484, at *3 (C.D. Cal. Mar. 25, 2024); *Comco-OneWorld, Inc. v. Radford Quarries, Inc.*, No. 3:17-CV-01140, 2018 WL 10151220, at *4 (M.D. Tenn. Sept. 13, 2018).

"As the Supreme Court has explained, 'long-settled federal law provid[es] that in all cases in federal court, . . . state law is incorporated to determine the availability of prejudgment remedies for the seizure of person or property to secure satisfaction of the judgment ultimately entered.'" *Rosen*, 21 F.3d at 1530–31

(quoting *Granny Goose Foods, Inc. v. Brotherhood of Teamsters Local 70*, 415 U.S. 423, 436 n. 10 (1974)). Accordingly, Georgia law interpreting O.C.G.A. § 44-14-234, not federal law governing preliminary injunctive relief, guides the Court's analysis.

Two provisions are at issue here. First, O.C.G.A. § 44-14-234(1) and (2) contain procedures for a debtor to pay certain amounts into court pending the collateral foreclosure trial, and come into play where, as here "the issue of the right of possession cannot be finally determined within two weeks from the date of service of the copy of the summons." Paragraph (1)(A) provides for paying admittedly past due amounts "for which there are no allegations of defenses or claims which, if proven, would offset said amounts alleged past due."[7] If the debtor and secured creditor dispute the amounts actually due, "the court shall determine the amount to be paid into the court in the same manner as provided in paragraph (2)."

Paragraph (2) provides for a hearing to determine the amounts to be paid into the court and permits the Court to consider "evidence of the amounts actually due or to become due, including any security agreement and evidence of any claims or defenses arising out of the same transaction." A hearing under that section is not a hearing on the merits; "the trial judge should only determine

---

[7] Paragraph (1)(B) concerns amounts that come due after the filing of the collateral foreclosure petition, but neither party relied on this provision at the hearing, presumably because the last payment under the Note was due May 1, 2024.

whether there are allegations of defenses or claims which would offset amounts alleged past due." *Foskey v. Bank of Alapaha*, 249 S.E.2d 346, 347–48 (Ga. Ct. App. 1978) (quoting *Candler I-20 Props. v. Inn Keepers Supply Co.*, 222 S.E.2d 881, 884 (Ga. Ct. App. 1975)).

The second provision, paragraph (4), provides that "[i]f the defendant fails to comply with any provision of this Code section to the detriment of the plaintiff, the court shall issue a writ of possession," provided that the "issuance of a writ of possession shall not affect the merits of the case but shall only affect the right to possession pending a final decision on the merits."

## B. Application to the Facts

LifeBrite seeks a pretrial writ of possession. As noted above, to prevail on its request, (a) it must show that ECHP "fail[ed] to comply with any provision of" O.C.G.A. § 44-14-234, and (b) such failure was to its "detriment." LifeBrite points to ECHP's failure to pay the Note balance into the Court under O.C.G.A. § 44-14-234(1). Putting aside the question of "detriment," to determine whether ECHP violated that paragraph of the statute, the Court must determine whether there is any amount "admitted to be due and for which there are no allegations of defenses or claims which, if proven, would offset said amounts alleged past due." O.C.G.A. § 44-14-234(1). To make this determination, the Court must proceed as required under O.C.G.A. § 44-14-234(2) and "determine whether there are allegations of

13

defenses or claims which would offset amounts alleged past due." *Foskey*, 249 S.E.2d at 347–48.[8]

What follows is a nesting doll of legal conclusions. In summary, if ECHP has plausibly alleged it can set off or recoup the amounts owed under the MSA against the Note, it has alleged a defense or claim in recoupment sufficient to avoid paying past due amounts into the Court. But ECHP can only allege setoff or recoupment if the terms of the Parties' agreement and Georgia law permit a breach of the MSA to be raised as a defense to payment of the Note. And ECHP can only allege a breach of the MSA occurred if it can plausibly allege that LifeBrite has failed to indemnify it as required by the MSA.

To unpack the first "layer" of the argument, the Court must determine whether ECHP can offset or recoup a breach of the MSA against a breach of the Note. Without determining whether any such breach occurred, the Court concludes it can. Several rules of construction guide the Court's analysis. First,

---

[8] While neither party addressed what pleading standard applies to whether ECHP has adequately alleged defenses or claims in recoupment, the Court assumes the Federal Rules of Civil Procedure govern. ECHP raised an affirmative defense of setoff in its Answer. (Doc. 5, Def. ¶ 5). While under the federal rules, this should have been designated as a counterclaim in recoupment, the rules allow the Court to treat the claim as properly designated. Fed. R. Civ. P. 8(c); 5 Fed. Prac. & Proc. Civ. § 1275 (4th ed.); *accord Reiter v. Cooper*, 507 U.S. 258, 263 (1993). When properly designated as a claim in recoupment, the pleading standard requires "sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).

there appears to be no reasonable dispute that the MSA and Note were part of the same transaction. "Under Georgia rules of contract construction, where multiple documents are executed at the same time in the course of a single transaction, they should be construed together." *Rounds v. Hall Cnty.*, 885 S.E.2d 256, 262 (Ga. Ct. App. 2023), *cert. denied* (Ga. Sept. 6, 2023) (quoting *Martinez v. DaVita, Inc.*, 266 Ga. App. 723, 727, 598 S.E.2d 334 (Ga. Ct. App. 2004)); *see also* O.C.G.A. § 24-3-3(a) ("All contemporaneous writings shall be admissible to explain each other."). Georgia law disfavors rendering any portion of a contract superfluous; "[t]he construction which will uphold a contract in whole and in every part is to be preferred, and the whole contract should be looked to in arriving at the construction of any part." O.C.G.A. § 13-2-2. Finally, "when a provision specifically addresses the issue in question, it prevails over any conflicting general language." *Avion Sys., Inc. v. Thompson*, 666 S.E.2d 464, 467 (Ga. Ct. App. 2008) (quoting *Woody's Steaks, LLC v. Pastoria*, 584 S.E.2d 41 (Ga. Ct. App. 2003)).

At issue here is whether the provision in the Note that payment is "absolute and unconditional" (Doc. 10-1) conflicts with the provision of the MSA providing that in the event of an indemnity claim, ECHP "shall look first to the then-outstanding balance of the Note, which shall be set-off and reduced by the amount of such party's Losses." (*Id.* at ECF p. 41). The Court acknowledges that it has previously given weight to the fact that the parties agreed that payment of the

Note is "absolute and unconditional." (Doc. 21 at 8). However, in context, the Court merely held that "[t]his indicates that the parties did not intend for litigation arising from the MSA to impact ECHP's obligation to pay or LifeBrite's exercise of remedies under the Note." (*Id.*).[9] It did not hold that an express provision of the MSA permitting setoff against the Note would be inoperative. It is conceivable that litigation could arise under the MSA on grounds unrelated to indemnification that would not justify a stay of collection activity under the Note.

Instead, the Court concludes, as ECHP argued at the hearing, that the provision in the MSA about offsetting losses against the Note is a specific provision that governs over the more general provision in the Note that payment is "absolute and unconditional." This conclusion is bolstered by the background rules of Georgia contract law. *Wolf Creek Landfill, LLC v. Twiggs Cnty.*, 786 S.E.2d 862, 866 (Ga. Ct. App. 2016) ("The parties . . . are presumed to have contracted with reference to the existing laws and their effect on the subject matter.") (citing *Satterfield v. S. Reg'l Health Sys.*, 634 S.E.2d 530 (Ga. Ct. App. 2006)).

Under Georgia law, "[r]ecoupment is a right of the defendant to have a deduction from the amount of the plaintiff's damages for the reason that the plaintiff has not complied with the cross-obligations or independent covenants

---

[9] The Court notes it was not supplied with a complete copy of the MSA at the time; ECHP's Motion to Dismiss only contained (heavily redacted) excerpts. (Doc. 4-1).

arising under the contract upon which suit is brought." O.C.G.A. § 13-7-2.[10] In the context of a negotiable instrument under Georgia's version of the Uniform Commercial Code (UCC), an instrument[11] that is otherwise "unconditional" is still subject to a "claim in recoupment of the obligor against the original payee of the instrument if the claim arose from the transaction that gave rise to the instrument." O.C.G.A. §§ 11-3-106, -305.[12] The Court concludes that, absent more specific language waiving recoupment, the parties' likely intent in making payment under the Note "unconditional" was to comply with the UCC's requirement that payment of an instrument be unconditional, not to preclude the remedies of setoff or recoupment as provided for in the MSA. *Cf. Super98, LLC v. Delta Air Lines, Inc.*, 309 F. Supp. 3d 1368, 1381 (N.D. Ga. 2018) (holding even more specific language

---

[10] The parties and MSA refer to "setoff" rather than "recoupment"; Georgia law distinguishes the two as follows: "Recoupment differs from setoff in this respect: Any claim or demand the defendant may have against the plaintiff may be used as a setoff, while only a claim or demand arising out of the same transaction as that sued on by the plaintiff may be used as a recoupment." O.C.G.A. § 13-7-3. Because the MSA and Note were part of the same transaction, the Court uses the term recoupment rather than setoff in the remainder of this Order.

[11] O.C.G.A. § 11-3-104(b) defines "instrument" as "negotiable instrument," and a negotiable instrument must be, among other things, "an unconditional promise or order to pay a fixed amount of money." O.C.G.A. § 11-3-104(a); *see also* O.C.G.A. § 11-3-106 (defining what constitutions an unconditional promise or order).

[12] Different rules, not relevant here, apply where the instrument has been transferred or negotiated and is being enforced by a person other than the original payee. O.C.G.A. § 11-3-305(a)(3), (b).

that "[a]ll payments required under this Agreement will be made in full without set-off or counterclaim" did not necessarily constitute intent by the parties to preclude recoupment.").

Having peeled back the first layer of the argument, the Court next must consider whether ECHP has alleged a plausible claim in recoupment that "if proven, would offset said amounts alleged past due." O.C.G.A. § 44-14-234(1)(A). As noted above, ECHP's alleged Losses included:

| | | |
|---|---|---|
| United Demand | - | $137,616.32 |
| Cigna Demand | - | $563,924.58 |
| EEOC Charge | - | $2,000.00 |
| (plus attorney's fees) | - | $9,336.00 |
| **TOTAL:** | | **$712,876.90** |

However, as LifeBrite pointed out, the Cigna Demand was settled for $175,000.00, which would reduce the losses as follows:

| | | |
|---|---|---|
| United Demand | - | $137,616.32 |
| Cigna Demand | - | $175,000.00 |
| EEOC Charge | - | $2,000.00 |
| (plus attorney's fees) | - | $9,336.00 |
| **TOTAL:** | | **$323,952.32** |

LifeBrite notes that this is $217,609.54 less than ECHP's unmade payments under the Note.

Determining whether ECHP alleged a plausible claim in recoupment for indemnification under the MSA as to the United Demand, the Cigna Demand, and the EEOC Charge, and in what amount, requires further review of the MSA and Georgia law. "Georgia law continues to recognize two broad categories of indemnity: as created by contract, as between a surety and a debtor; and under the common law of vicarious liability, as between principals and agents." *CSX Transp., Inc. v. City of Garden City*, 391 F. Supp. 2d 1234, 1238 n.5 (S.D. Ga. 2005) (citing *City of College Park v. Fortenberry*, 609 S.E.2d 763 (Ga. Ct. App. 2005); *J.C. Penney Co. v. Malouf Co.*, 196 S.E.2d 145 (Ga. 1973); 41 Am. Jur. 2d Indemnity § 2 (May 2004)). "[T]he scope of a written indemnification contract is a question of law for the court, which must strictly construe the contract against the indemnitee[.]" *Newton's Crest Homeowners' Ass'n v. Camp*, 702 S.E.2d 41, 47 (Ga. Ct. App. 2010), *aff'd sub nom. Kennedy Dev. Co. v. Camp*, 719 S.E.2d 442 (Ga. 2011) (quoting *George L. Smith II Ga. World Cong. Ctr. Auth. v. Soft Comdex, Inc.*, 550 S.E.2d 704, 705 (2001)).

"Generally, indemnity agreements fall broadly into two classes, those in which the contract is to indemnify against liability and those in which it is to indemnify against loss." 41 Am. Jur. 2d Indemnity § 23 (note omitted). The difference between the two is that "[i]n the first, the cause of action arises as soon

as liability is incurred, but in the second, it does not arise until the indemnitee has actually incurred the loss." *Id.* (note omitted).

The MSA is a contract against loss, not a contract against liability. Several provisions provide support for this conclusion. First, the indemnifying agreement is explicitly triggered by losses incurred: "LifeBrite and the LifeBrite Members shall defend, indemnify and hold harmless . . . [the] ECHP Indemnified Parties . . . from and against any and all **Losses** that such Authority [sic] Indemnified Parties **incur** as a result of [covered reasons]." (Doc. 36-1 at ECF p. 40) (emphasis added). And the indemnification provision is not the only clause that anticipates "Losses" being "incurred." (*Id.* at ECF p. 42) ("10.7 Mitigation; Alternative Arrangements. The Indemnified Party shall take commercially reasonable steps to mitigate any Losses it may incur or allege to have incurred pursuant to this Agreement."). The MSA also distinguishes between third party claims or liability asserted in writing and Third-Party Claims for Losses, providing for an opportunity for the indemnifying party to take certain actions in response to a written claim or liability prior to paying on account of a loss. (*Id.* at ECF p. 41–42) ("10.5 Notice and Control of Litigation; Third-Party Claims[:] If any claim or liability is asserted in writing by a third party (a 'Third-Party Claim') against a party entitled to indemnification under this Section 10 (the 'Indemnified Party') which would give rise to Third-Party Claim for Losses under this Section 10, the Indemnified Party shall notify

the Party to provide indemnification pursuant to the terms of this Agreement (the 'Indemnifying Party') in writing of the same within twenty (20) days of receipt of such written assertion of a Third-Party Claim.").

The Court's determination that the MSA indemnifies against loss and not liability is dispositive. "A cause of action on a contract indemnifying against loss or damage does not arise until the indemnitee has actually incurred loss." 41 Am. Jur. 2d Indemnity § 24 (note omitted). "Therefore, the obligation to indemnify arises at the time of payment of the underlying claim, the payment of a judgment on the underlying claim, or payment in settlement of an underlying claim." *Id.* (note omitted). Pretermitting the issue of whether the United Demand (which is alleged to remain outstanding) constitutes a Loss, LifeBrite is correct that ECHP has failed to plausibly allege that the Cigna Demand was a Loss under the MSA prior to when at the very least settlement was consummated.[13]

---

[13] The Court notes that it bases this ruling on the claims in recoupment as alleged under the federal pleading standard; a hearing under O.C.G.A. § 44-14-234 is not a substitute for a trial on the merits. The Court's ruling should in no way prejudice ECHP's claims for indemnification in the Early County Litigation. Moreover, ECHP has not provided the Court with any authority that an anticipatory breach of an indemnification against loss can be pleaded as a claim in recoupment.

The Court also notes that the MSA also contained duties to defend as well as to indemnify against Losses. This also appears to be a subject of the Early County Litigation. *In re First Am. Health Care of Ga., Inc.*, 288 B.R. 598, 607 (Bankr. S.D. Ga. 2002) ("[T]he duty to defend and the duty to pay are independent obligations.") (quoting *Colonial Oil Indus. Inc. v. Underwriters Subscribing to Pol'y Nos. TO31504670 & TO31504671*, 491 S.E.2d 337, 339 (Ga. 1997)). No specific allegations or evidence

The Court recognizes that this creates a potential for (at least temporary) double-liability because it would freeze resources that ECHP could use to resolve Losses under the MSA and thereby decrease its liability under the Note by forcing it to deposit that money into the Court. But ECHP bargained for indemnity against loss, not liability.

Having concluded that ECHP has failed to pay, at the very least, $217,609.54 of the Note balance admittedly due and not subject to a properly pleaded defense or claim in recoupment, the Court returns to the original question before it: assume ECHP, by failing to pay at the very least $217,609.54 into Court, did not comply with some portion of O.C.G.A. § 44-14-234, must the Court issue a writ of possession? Here, the Court parts ways with LifeBrite.

LifeBrite argued at the Hearing that ECHP's offer to pay the funds at the hearing was untimely because it should have been made within two weeks of service of the Complaint. (Tr. 6–7). But O.C.G.A. § 44-14-234(2) provides for the Court to "set a hearing date to determine the amount to be paid into the court" in case there is controversy as to the amounts due. It does not require that a demand for the hearing to be made at any time, or for the hearing to take place at any point in order for a defendant to seek its protection. If the Court has the authority to

of losses incurred due to a failure to defend were presented to the Court aside from the EEOC Charge, and the Court expresses no opinion as to whether LifeBrite breached its duty to defend.

determine the amount to be paid into Court at some point between filing of the petition and trial, surely the Court has the authority to set the terms for paying the amount so determined. Otherwise, the hearing would not be to determine "the amount to be paid in court," but rather to determine whether the defendant correctly disputed some of the past due amount. The Court does not read the statute as providing for such a high-stakes, up-or-down proceeding. Accordingly, the Court will fix the amount to be paid into Court at $217,609.54,[14] and order that ECHP pay that amount by no later than fourteen days from the date of entry of this Order. Failure to pay such amount will result in the issuance of a writ of possession under O.C.G.A. § 44-14-234(4).

## II.    Request for Preliminary Injunctive Relief

In the alternative to their request for a pretrial writ of possession pursuant to Rule 64, LifeBrite also seeks a preliminary injunction requiring ECHP to surrender possession of the Company under Rule 65 on the grounds of irreparable

---

[14] The Court declines to order ECHP to post the full $541,561.86 for the simple reason that ECHP offered to post this amount at the hearing, but LifeBrite refused, insisting on immediate possession on the grounds that ECHP already should have already paid at least $217,609.54 into Court. In so doing, LifeBrite could have argued that more than $217,609.54 of the past due balance was not in dispute for the purpose of the hearing under O.C.G.A. § 44-14-234(2), but did not do so (aside from arguing that the Note is unconditional). LifeBrite can, of course, continue to seek to foreclose based on a failure to pay any amounts due under the Note at a trial of this matter.

injury. At the Hearing, LifeBrite pointed to "funny business going on with the operation of [the] hospital." (Tr. 36:25–37:1). This presumably refers to the issues the Court discussed in Part III of the Background Section, above. LifeBrite seeks an injunction requiring payment of outstanding amounts into the Court and prohibiting ECHP "from transferring, encumbering, concealing, selling, or otherwise disposing of or devaluing the" Company. (Doc. 34 at 2). Alternatively, LifeBrite appears to argue that this alleged financial misconduct provides a separate basis to order possession pending trial. (*See* Tr. 41:12–42:5).

The legal standard for preliminary injunctive relief is set forth above, but the Court focuses on two factors which it finds dispositive here: irreparable injury and public interest. As the Eleventh Circuit has explained, "[a]n injury is 'irreparable' only if it cannot be undone through monetary remedies." *Ne. Fla. Chapter of Ass'n of Gen. Contractors of Am. v. City of Jacksonville*, 896 F.2d 1283, 1285 (11th Cir. 1990). Therefore, "[t]he possibility that adequate compensatory or other corrective relief will be available at a later date, in the ordinary course of litigation, weighs heavily against a claim of irreparable harm." *Id.* (quoting *Sampson v. Murray*, 415 U.S. 61, 90 (1974)). This analysis of potential remedies necessarily entails consideration of the causes of action brought here. *Cf. Al-Abood v. El-Shamari*, 71 F. Supp. 2d 511, 516 (E.D. Va. 1999) ("Plaintiff has supplied evidence of questionable financial transactions conducted by Defendants. . . . These

transactions appear to have diminished Defendants' overall traceable wealth. Plaintiff has not, however, adequately demonstrated that the transactions in question have rendered Defendants either insolvent or unable to meet their obligations with regard to the jury's award of damages.").

As ECHP pointed out multiple times at oral arguments, this collateral foreclosure action is fundamentally a collection action. (Tr. 4:11–19, 20:9–21:10). While LifeBrite is correct that, as a secured creditor, it has the right to proceed on the Note or against the collateral or both in any order, O.C.G.A. § 11-9-601(a)(1), (c), the debtor always has a right to redeem the collateral and force the secured creditor to accept payment of the secured obligations in lieu of the collateral prior to disposition of the collateral. O.C.G.A. § 11-9-623. As such, LifeBrite cannot show an irreparable injury if it is reasonably certain that ECHP can fully discharge the obligations on the Note, and ECHP's offer to pay some or all of the disputed amount of the Note balance into the Court makes such payment reasonably certain.

Aside from the lack of irreparable injury, the Court is very concerned about the public interest factor. As noted above, the Company operates the only hospital within a 35-mile radius. (Fletcher Decl. I ¶ 13). Interrupting normal operations, or abruptly changing management, could have serious unforeseen consequences on the scale of life and death. Such an interruption in management could be made

25

even more disruptive by the potentially temporary nature of the situation, since ECHP could regain management by redeeming the collateral or prevailing at trial. LifeBrite did not present sufficient evidence to dispel these concerns, instead focusing on the public interest in favor of parties abiding by contract provisions and against ECHP allegedly being paid massive amounts from the Company. (Tr. 42:17–25).

For these reasons, the Court finds LifeBrite's proposed injunctive relief improper and will deny the Motion on these grounds as well.[15]

## III.   Stay of the Case

ECHP has previously asked the Court to stay this case pending the Early County Litigation. (Doc. 4-1 at 7) (citing *Clinton v. Jones*, 520 U.S. 681 (1997)). While

---

[15] Although not discussed by the parties, it appears that legal remedies exist which would bar the grant of equitable relief, at least to the extent LifeBrite seeks pretrial possession of the Company on grounds other than non-payment. *Ne. Fla. Chapter of Ass'n of Gen. Contractors of Am. v. City of Jacksonville*, 896 F.2d 1283, 1285 (11th Cir. 1990) ("The basis of injunctive relief in the federal courts has always been irreparable harm and inadequacy of legal remedies.") (quoting *Sampson v. Murray*, 415 U.S. 61, 88 (1974)). A state law remedy for misconduct involving the collateral exists under O.C.G.A. § 44-14-239 where "the purchaser of mortgaged property is seeking to remove the property outside of the county, or when the defendant is seeking to dispose fraudulently or is fraudulently disposing of the mortgaged property and a disposal of the property will lessen the security." Moreover, O.C.G.A. § 44-14-237 provides a means for a defendant to "transfer, remove, or convey any of the secured property" so long as they post a bond "for a sum equal to the value of the property or the amount of the alleged remaining balance, whichever is less."

the Court denied the request then, this Court has "discretion to revisit [its] prior interlocutory orders, considering both the weight of the moving party's arguments and the disruption that a change would cause in light of the time that has passed since the decision was initially made." *Hornady v. Outokumpu Stainless USA, LLC*, 118 F.4th 1367, 1381 (11th Cir. 2024).

A trial on LifeBrite's collateral foreclosure claim will necessarily require the Court to determine that ECHP has defaulted on the Note. Such a determination would require passing on ECHP's claims in setoff and recoupment and would result in a final determination as to the Parties' respective rights and liabilities under the Note and MSA. This determination would necessarily undermine the object of the first-filed Early County Litigation. The purpose of this civil action, determining which Party should remain in possession of the Company pending the determination of the Parties' claims against each other, has been served by this Order. As such, the Court is inclined to stay this action pending the resolution of the Early County Litigation. The Parties are directed to submit supplemental briefs on whether the Court should reconsider its earlier denial of ECHP's request to stay this litigation.

## Conclusion

For the above reasons, it is

**ORDERED** that Plaintiff LifeBrite Hospital Group, LLC's Motion for Preliminary Injunction (Doc. 34) is **DENIED**. It is

**FURTHER ORDERED** that Defendant ECHP, Inc.'s Motion for Leave to File Sur-Reply (Doc. 41) is granted. It is

**FURTHER ORDERED** that the Parties are **DIRECTED**, within 3 business days of the date of entry of this Order, to submit a proposed Order under Local Rule 67.1(A)(1) for ECHP to deposit funds in the amount and at the time provided by this Order. It is

**FURTHER ORDERED** that the Parties are directed to submit simultaneous supplemental briefs, no longer than 7 pages in length, as set forth in this Order by **NO LATER THAN** January 6, 2025.

**SO ORDERED** this 16th day of December, 2024.

Victoria Marie Calvert
United States District Judge